May it please the Court, my name is John Klein and I am here on behalf of Mr. Salman. I'd like to talk about three issues if my time permits, although of course I welcome the Court to direct me to what it really wants to hear. One issue is the admissibility of the Bayou statement, the very same statement you were just hearing about. The second issue is the deliberate ignorance instruction. And the third issue, which was recently raised in the supplemental briefs, has to do with the Newman case and its possible impact here. I'll start with the Bayou statement. As I think my preceding counsel mentioned, initially the government wanted to combine these two trials, Bayou and Salman. And in the course of that discussion, this statement came up and the government told the Court, don't worry about it. We'll have a limiting instruction that will come in only against Mr. Bayou and it won't be a problem. The Court declined to join the two trials. Mr. Salman went to trial on his own. And suddenly this statement by Mr. Bayou was coming in against Mr. Salman. Suppose the counsel says it wasn't offered to prove the truth. That is what counsel said to deal with the hearsay and the confrontation clause issue. It did not deal with the 403 issue, which is a, even if it, to the extent it came in for its. Are you arguing 403? Yes. But I'm going to start with the confrontation clause issue because it did end up coming in for its truth. Certainly the government emphasized at points in its argument the falsehoods in Mr. Bayou's statement. But in rebuttal, one of the key issues in this case was why Mr. Salman was wiring money into a Charter I bank account. And Mr. Salman's counsel argued, based on some evidence that she elicited, that he was wiring it in because he and Mr. Bayou were doing business together. So the government, and this is important because the whole issue was Mr. Salman's state of mind. Did he have guilty knowledge? And the government said he's using this circuitous path for the money because he knows he's doing something wrong. And Mr. Salman's lawyer was arguing he was doing this because he and Mr. Bayou were in business together and this was their business bank account. But in the 29-minute interview, he didn't mention the restaurant business, right? Wasn't that the government? I appreciate that that's not what the government argued in closing. The government misstated the evidence, I think. The government said two things. It said, first, that Mr. Bayou did not mention the restaurant business. But it was. Did you object? Or whoever the trial counsel was? I was not the trial counsel. Not to the closing argument. So is this not about an unfortunate misstatement at worst by the government, Your Honor, upon a summation to which no objection was taken and has not been raised as an issue in this appeal? What does it have to do with the admissibility for its falsehood of the 29-minute interview? Well, because what it shows, Your Honor, is that the concern the defense raised initially, which is that this statement is not going to come in just for its falsity, was valid. There was no limiting instruction, and the statement came in, just came in. It was just played for the jury, and it was there for the government to make of whatever it wanted in closing. So easily curable, if this one mischaracterization by the government on rebuttal, all you have to do is you could have objected to it then, you could have, at the close of the argument, you could have asked for a curative instruction. None of those things were done. And now, and nor are you raising it as a problem on appeal per se, you're just saying that, oh, somehow this shows that the fears we had about the introduction of the 29 minutes were realized. But the overwhelming thrust of the government's argument about the 29 minutes was that it was a false statement which could only have arisen because Mr. Bayou only knew that this was a scheme because of your clients telling him. So two quick responses. One is the Confrontation Clause issue was a major objection from the beginning, and this use of the statement in rebuttal for its truth was a clear violation of the Confrontation Clause. Should counsel have objected? Perhaps. But the bottom line is this statement ended up coming in without a limiting instruction and being used by the government for its truth. But now to your second point, Your Honor, which is the use of the statement for its falsehood. And I think you have correctly articulated what I now understand to be the government's theory of relevance. Why is this falsehood by Mr. Bayou relevant as to Mr. Salmon? And I will confess that in my opening brief, I thought the argument was that somehow Mr. Salmon's, like in the Traula case, Mr. Salmon's failure to correct it or to object to it, somehow it was relevant in that sense. There's no evidence here that Mr. Salmon had any knowledge that Mr. Bayou was talking to the SEC, had any knowledge that Mr. Bayou was lying to the SEC, that Mr. Salmon had any connection whatsoever to Mr. Bayou's statements to the SEC. So the notion that Mr. Bayou would only have been lying to the SEC because somehow Mr. Salmon told him something, confessed something to him, has absolutely no support in the record. And in fact, by this point, this is two months after the last trade. So the biocyte trade occurs in like March of 2007. Now we're in May, and Mr. Bayou is being questioned by the SEC. By that point, Maher Khara had been questioned. I think Munir Khara had been questioned. Everybody knew that the SEC was looking into this. So it is not uncommon for people in this – take Mr. Salmon out of the picture entirely. Mr. Bayou is in this situation where the SEC is looking into a trade that he participated in. People lie under those circumstances fairly regularly. That's what Mr. Bayou apparently did. Why that lie, without any connection whatsoever to Mr. Salmon, comes into evidence in Mr. Salmon's trial is beyond me. And it shouldn't. It's not relevant, and it's a 403. Well, that would be an argument you could make. But why couldn't a jury reasonably infer that he knew that what he was doing was illegal? That's why he lied to the SEC, Mr. Bayou. And what he – and the reason he knew it is because he was – he had been assisting your client in this illegal scheme and had learned from your client the illegality of it. Because on the second part of your – I'm willing to agree that by May of 2007, Mr. Bayou had some concern that he was engaging in illegal conduct, but that's presumably why he lied to the SEC. Are you agreeing with the part of the question that posited that it may be – indicate consciousness of guilt? Are you agreeing with that? It certainly could indicate Mr. Bayou's consciousness of guilt. Okay. I just wanted to be clear about which part you're agreeing with before you go on to Part 2. Yes. By May of 2007, Mr. Bayou certainly had a concern that he was involved in something that was going to get him into trouble. Okay. And that's presumably why he lied. The second part is where the problem comes in, because there was no evidence in the record whatsoever that would permit a jury to infer that Mr. Bayou was worried because of something Mr. Salmon had said to him, some confession Mr. Salmon had made. By the way, Kareem, we've been doing this based on information from Maher. There was nothing like that. So, Your Honor, what you're talking about is a reasonable inference, I would say, would be pure speculation on the part of the jury, and that shouldn't be permitted. It should not be permitted in a case like this. So that's the Bayou statement. I'll move to the deliberate ignorance instruction. And I want to try to save a couple of minutes for rebuttal. This case presents a very interesting issue. Just a couple of days ago, there was a case from the Seventh Circuit, which I provided to the court in a 28J letter. I hope you got it. And the question is, after global tech, is it enough to have a deliberate ignorance instruction where you are aware of a high probability that a certain fact may be true? That's the first prong of global tech, and let's assume that the facts establish that here. But on the second prong of global tech, all you do is fail to investigate. You don't cover your eyes. You don't say, don't tell me. You don't deliberately look away when some bad thing is about to happen. You just don't investigate. Under circumstances where the failure to question, to ask questions, is either unnatural or abnormal. That's what that Seventh Circuit case says. That's what our cases say. And that seems to me to fit the bill here. So why is that wrong? Well, but think of the facts of that Seventh Circuit case. Judge Posner sort of said maybe, maybe, he says, that there's a duty to investigate. No, not a duty. No, that is definitely not what he said, and that's not what our cases say. Our cases say that if you're in a situation where the facts presented to you just scream out for, yeah, you would want to know in this instance, well, what's the source of this tip? Why am I getting this information? If the circumstances are such that it would be totally unnatural for you not to inquire, that can be deemed deliberate action or, right? Judge Posner talked about two possibilities. And again, this was, this was basically victim at the end. We're not bound by what Judge Posner said. I'm talking about our cases. What our cases say, and they're consistent with what Judge Posner happened to hypothesize about, but what our cases say is what I just put to you. So what's your response? Does this case not fall within that umbrella? The response is that it is the, in every case where you have the possibility of a deliberate ignorance instruction, you're going to be aware of a high probability of some fact being true. So in every case, the facts to satisfy that first prong, in your words, Your Honor, they scream out. That's the whole red flag problem. The question is, and that's recklessness. If you go forward, when the facts scream out that some fact that you're not aware of may be true, that's recklessness. And that's not enough, according to Global Tech. What sets deliberate ignorance apart from recklessness is the second prong, the deliberate ignorance prong. I mean, deliberate action prong. And a simple failure to ask, to investigate, to inquire, that's nothing more than recklessness. And you're saying that that can never be enough. And I'm saying that post-Global Tech, we have cases that say it can be. And I'm sympathetic to your argument, but we're bound by what our cases say. Well, you have two cases, Lytle and I'm forgetting the name of the other one. That say failure to investigate satisfies that. In circumstances where, yeah, it's incumbent upon you before you continue to act to inquire about, well, what's really going on? But what I would say, Your Honor, is neither one of those cases talks about Global Tech. The issue didn't come up. The case was only cited in the briefs in one of those cases and for a different point. Global Tech is not intervening authority because they're post-Global Tech. So it's not like we can just say, oh, well, those cases are no longer good. Well, what I think you can say, Your Honor, is that those cases did not consider the question that I'm presenting to you here. And that is, what is the impact of Global Tech on the second prong of the deliberate ignorance standard? They just didn't address the effect of Global Tech. Now, Messiahs, the Seventh Circuit case, does. A non-criminal case, the Love Darts case from this court, does address that. In the Yi case, Global Tech is specifically mentioned and the Global Tech standard is set out. The two cases, though, that Lytle and, I'm sorry, Ramos-Sotoma. You know the case I'm talking about. Those cases just don't address this issue. Yes, they're post-Global Tech. Yes, they contain that language. But they don't analyze the issue. And I think, Your Honor, I don't think we're free just to say, well, we're not going to follow them then. I mean, they hold what they hold. And you might be right that there's some tension with Global Tech. But I don't think as a three-judge panel we can just brush them aside. Is that what you're asking us to do? I've got the very same problem. Is that what you're asking us to do?  And I don't, I understand the issue you're raising. You've got two cases, post-Global Tech, that if you want a sound bite, the sound bite is failure to investigate is enough, basically. But in neither one of those cases was the issue presented. Because I read the briefs. I had that same concern. I pulled the briefs. I read them. The issue never came up. So the court, although it utters those words, it never considered the question that is being raised here. And so, yes, I think you, are you bound by it? Of your predecessor panels, that's not what we have in those two cases. Did you want to reserve some time? I would like to reserve some time. That's probably a good point to stop, because you've only got a minute and a half left. Okay, thank you. You bet. May it please the Court, my name is Mary Jean Chan, and I represent the United States in this appeal. I'd like to start off with the Bayouk statement. As this Court noted, this panel noted, it doesn't implicate the defendant's confrontation clause rights because it was only submitted for the falsity of its statements. It is true that the prosecutor's closing argument could be possibly construed as stating otherwise, but if you look two sentences prior to that, the defense, sorry, the prosecutor said, he never said his trading with Mr. Salmon was business related. And that was really the thrust of his argument, which was what was absent from the 29-minute interview. If Mr. Bayouk had believed or had a legitimate business excuse for the trading with respect to buy a site, with respect to USPI, that you could expect that he would have told the SEC that in the interview. And because he didn't, that there was really no legitimacy that existed. But you think the government was commenting on the absence of this excuse or reason? Absolutely. I think it's clear from the context of the argument. I think it's clear from the transcript itself. The 29-minute interview doesn't ever mention a business-related excuse for the trading. I agree with you about the interview. I'm just wondering if the government misstated the evidence in closing, and I'm not sure that's really here nor there. There was no objection. Is that right? That's exactly right. There was no objection because I think it was clear. I mean, everybody knows that in closing arguments, sometimes you're speaking off the cuff and not everybody is as articulate as you'd like to be. But I think it was clear from the thrust of the argument that, and again, I just point you to the two sentences beforehand where the prosecutor said he never, meaning Bayouk, never said his trading with Mr. Salman was business-related. He was pointing to the absence of what was stated, not to anything affirmative that was stated. And I think that's supported by the actual evidence and also by the fact that there was no objection. The whole statement did come in, Your Honors, but that was at the defendant's agreement. The government actually offered to redact any statements that could plausibly be considered to be true. And there were certainly true statements, what his name was, the fact that he owned some businesses. There were true statements in the 29-minute interview, but the defense position was that if any of it was going to come in, all of it should come in, and they didn't want redactions. So I think that sort of counters the argument about the fact that the government allowed the whole, or the district court allowed the whole statement to come in. There was certainly support in the record for the connection between Salman and Bayouk, and I think Judge Rakoff and Judge Wofford, you all alluded to that, which was that, first of all, that Bayouk was trading basically the front man for Salman, that they were both putting money together into this CoAmerica account, and they were trading on that, that although Bayouk only put in about 33% of the cash for the trading, he took about 66% of the profits, and so he was being paid essentially a commission to be the front man, to be the person who would try to thwart the SEC if they ever came knocking, that he actually, that Salman actually told Michael Kara after the interview that Bayouk had told the SEC that he knew nothing. So there's certainly a lot of evidence in the record to support that there was a connection between Salman and Bayouk, and that when he lied to the SEC, it was with a consciousness of guilt that came from what he knew from Salman. I mean, this was a very circuitous route that they took for Salman to actually do the trading. With respect to the 403 analysis, Your Honors, again, there was no question that there was relevance to this evidence. The district court noted that, and the district court also found that because the defendant had the ability to cross-examine Martha Dewing, who was the person who had testified that Bayouk actually made the statement, and because the defendant had the ability to cross-examine all the different people who had testified to what the core of the government's case was, which was that Salman actually did know a lot of information that he received from the Karas, and that he had passed this on to Bayouk, all the things that made what the government contended Bayouk's statement to be false. Because the government, sorry, the defendant had the ability to cross-examine all of that, that there was no real prejudice to the defendant despite his inability to cross-examine Bayouk himself. Going on to the deliberate ignorance instruction, the deliberate ignorance instruction wasn't altered by GlobalTAC. GlobalTAC does sort of kind of aggregate and look at all the different instructions across the different circuits, and it kind of consolidates it in a description of those two prongs, the prong being that the defendant has to know that there's a high probability that what's happening is criminal and that he deliberately acts to not confirm that suspicion. So what's at issue there is the deliberate, the deliberation with which the defendant acts, not whether somebody actually acts or doesn't act, this kind of distinction they make between looking at something or closing your eyes or making a call or not making a call. And in this case, I think there was ample evidence to support the giving of the deliberate ignorance instruction. We have the defendant who was on the phone almost on a daily basis with Michael Carr, who was giving him tips. And naturally, in the course of relying on somebody's word to invest hundreds of thousands of dollars, one might ask, as Michael Carr actually testified he did, where is this information coming from? Why should I trust this? And if he didn't ask, if Mr. Selman did not ask, then I think there was ample basis for the jury to infer it was because he deliberately didn't want to know. It was kind of like what Maher Carr testified, that at some point he stopped asking his brother if he was trading on this information because he knew the answer was going to be yes and he just didn't want to hear that anymore. There was ample basis for the jury to find that was premeditated. The government's thrust, the thrust of the argument was that Michael Carr's testimony, that he told Selman that the source was from Maher, that there was actual knowledge there. But, of course, the jury could have rationally disregarded some of the testimony of Michael Carr, who was heavily impeached. He was really attacked over and over. And they could have found that all the other information that he said, all the stuff that was corroborated by the phone calls, the phone records, by the trading documents, all of that they might have believed, but maybe they didn't believe Michael Carr when he said that he actually specifically told Selman that the source was Maher. And so it would have been rational for the jury to conclude that there was a high probability that Selman knew that this was inside trading. That's why he took all these routes to protect his investments by going through Bayouk. That's why he was putting hundreds of thousands of dollars based upon tips that required him to trade instantaneously over a weekend to act on these tips, but that he didn't actually know, that he didn't have actual knowledge. And the jury could have also found that because Michael Carr had testified on certain instances that he had specifically told Selman, but that they didn't cover all of it. So there was ample basis for this. Your Honors, the third argument, the defendant never got to, so I won't reach that. I'll ask you some questions anyway. But I wanted to give the Court an opportunity in case you had some questions on that. So is it still your position, as it was when this was first raised post the original briefing, that the issue is not properly before this Court? Yes. And why is that? Because it was waived. The defendant raised the sufficiency issue in his trial motion for a new trial, and that was a briefing that took place three months after the opening brief in the Newman appeal was filed. But before, Newman was the sud. Right, but the same issues and the same arguments were there. And in fact, the motion for a new trial raises all those issues. So is it your position, if a decision comes down that, let's assume for the sake of argument, materially changes the law in an area, and you've never raised the argument, but you were aware of a brief that was filed in another circuit that did raise the argument that you have then waived it? Yes. Because you read every brief in the world. Well, no, but in fact, we actually have evidence that they were aware of Newman because they cited the district court case in Newman when they filed the briefing on the jury instructions. Yeah, but the district court in Newman was a totally different issue, or I shouldn't say that. But the critical issue in the district court was not an issue in your case. The issue there was whether the tippee had to know of the benefit given to the tipper. And the district court said no, and the Second Circuit said yes. In your case, the instruction already included  what changed in Newman was the definition of benefit. That was the material change. Well, I would argue that what the Second... So to begin with, and with all due reference, regard to the Second Circuit, the Second Circuit case is not binding upon this circuit. Dirks is, however. No one could disagree with that. I clerked in the Second Circuit, so I have a lot of respect for the Second Circuit. But it doesn't actually bind this court. The Ninth Circuit cases do. The Supreme Court case in Dirks does. And also, the facts in this case are completely... take it completely out of the realm of Newman. But I do think that it is... No, no, no, that's a different point. If we reach... that would be my next question.  If we do reach Newman, because for whatever reason... Because you find a waiver. ...we don't find a waiver, do you... Is it your position that Newman is wrong and or that even if Newman is right, and I'm talking about the benefit part of Newman, that you still prevail in this case? Well, I'll take the last part of the question. Yes, we definitely do prevail in this case because the benefit gloss was limited to a situation where you have a very remote tippee. Somebody was three or four levels away from the insider. In this case, you have a very close relationship. Newman sort of defined it as saying that you have to have evidence of a close... What was the benefit here that Simon knew about? Oh, well, he knew that there was basically a quid pro quo type of relationship between the two brothers, extremely close. In what respect? Michael paid for Maher's schooling. He paid for his college. He paid for part of his business school. Maher, on the other hand, was also paying... Excuse me, was cared a lot about his brother's welfare. He took time off from school after... Excuse me, time off from his career after graduation to care for Michael after he had an illness. And the biocyte transaction, I think, sort of epitomizes this type of thing, which is when Michael came to him asking him for a favor, saying that he was in trouble. Maher said, well, let me give you money. And instead, Michael said, no, don't give me money, give me information, because they understood this to be fungible. And essentially... What was the evidence that Simon knew that? Well, Simon was the brother-in-law of Maher. I know he was the brother-in-law, but that doesn't mean he knows every conversation between the two Mahers. Exactly, that's true, Your Honor, but he was there for the wedding toast where Michael specifically said in front of everyone that Maher gave him advice, was his mentor, that they were very close. Both brothers were weeping and very emotional about that. Michael testified that he was completely transparent with Simon, that Simon was almost his best friend, and that he told him a lot. We have evidence that Simon... The money he was referring... Maybe I have this wrong. Correct me if I do. The money he was referring to was money given before they started giving tips, yes? Right, but that showed you the kind of relationship they had in Dirks. But it may... That's the second question, which is, do you read Dirks as not requiring as much as the Second Circuit seemed to require by way of benefit in Newman? Well, I'm going to wait for the Department of Justice to come out with a position on that, Your Honor, but I would say that... Why not? I would say that in this case, the Second Circuit has never changed the definition of what Dirks said, which was that a gift to a trading relative would suffice as personal benefit. In fact, it's not cited in the briefing, but there's a district court case in the Second Circuit that talks about Newman and says that it doesn't change that definition. In this case, there's no question that Salman knew that Maher was giving information. And this isn't just a one-time deal. This is something that happened over and over again between 2004 through 2007, information that he had to turn on a dime because it was short-lived, short-acting information that was highly lucrative. It wasn't the kind of information in Newman where you have earnest... Sorry, analyst earnings that maybe, you know, possibly might not be insider information. But you have Salman knowing this, capitalizing on this, knowing that Michael and Maher are extremely close brothers and really, in a way, that if something benefits Michael, Maher's benefiting from it too because she's a caretaker. Did Salman know that Michael was trading... Was Michael trading on the information he got from the brother as well? They were both trading. In fact, they were making parallel trades. Salman and Michael were? Yes. Salman was trading through Bayouk, so it wasn't through his own Charles Robb account. Yes, but... They were parallel trades. They were parallel trades. So Salman knew that Michael was deriving, certainly deriving a benefit from the tips he was getting from his brother, right? Exactly. To me, that's fully sufficient right there, full stop. I'm glad to hear you say that. I mean, under Dirks, maybe not under Newman, but to the extent Newman says otherwise, I don't think we would be bound to follow it. And I don't think Newman does... I mean, Newman really deals with somebody who's quite remote. Here you have a complex of... They're all brother-in-laws. They're either brothers or brothers by marriage, and they're communicating with each other on, if not a daily, weekly basis, quite frequently over a course of, you know, 3 years. You're out of your time. Thank you very much. I ask for an affirmance. Could you put another minute on the clock, please? So you'll have 2 minutes. And let me talk about Newman. We've done this sort of in a strange order. But first, the waiver issue, Your Honor. The reply brief in this case was filed a month before Newman came out. I was certainly aware of the issue in Newman that the instruction, whether the tippee had to know that the insider was receiving a benefit. But as you point out, Mr. Solomon got that instruction. So I didn't think Newman was likely to have much bearing on this case. When it came out, there was this other aspect to it, which the Department of Justice certainly thought was the most important aspect because that was the only part they saw it rehearing on. And that was this refinement, if you want to call it that, or constriction, to use the government phrase, of the definition of benefit. That had a big impact here because the evidence of benefit was always – and we're talking, Your Honor, about benefit to Maher, not to Munir. Munir certainly got a benefit. He's providing for his brother. That is the classic benefit that Dirks was talking about. It seems to me it's squarely within what Dirks said. Why isn't it? Well, under pre-Newman law, any sort of benefit to a friend or family member, if you're providing it, it doesn't matter whether you, the insider, get anything or not. Newman changes that. In the Ninth Circuit? Well, that's the question, of course, is whether the Ninth Circuit is going to follow Newman. And I argue that it should. Your Honors may take a different view. And my guess is someday the Supreme Court is going to decide that question, if other circuits diverge from Newman. But to me it's very clear that that's not enough under Newman. Maher testified – Maher, yes, Maher, the insider testified. When they asked him at trial, what benefit did you get? Because, of course, even under pre-Newman law, he had to get some sort of benefit. The benefit, he said, was the way that I thought I was helping myself was just by getting him, Michael, off my back and fulfilling whatever needs he had. Didn't the jury also hear that Maher was getting information back from Michael, given his scientific background, to help him do his work at Citibank? Yes, but I don't think that's really relevant here. Well, it seemed to me like it was a back-and-forth trading of information, so I wanted to give you an opportunity to respond. The jury heard that, right? The jury heard that, but in my view, Your Honor, that was basically background by Maher to explain how this whole thing happened. And basically the way it started was Maher was talking to Michael to learn information to help him do his job as an investment on this thing. But that wasn't why he was giving Michael the information. It wasn't to keep Michael— Okay, it's his brother. It gets back to Judge Watford's point. But the jury heard the testimony that you just indicated where he was assisting his brother. He testified—I mean, the benefit, if you want to call it that, that Maher got was getting Michael off his back. That's what he testified. Michael was bugging him and bugging him and bugging him. And providing for his brother, who needed money. Who put him through so much. I mean, I just don't—that seems to me— I guess I'm happy to hear whatever else you have to say on that, but under Dirks, that's exactly the benefit that the court defined. Because the question is, again, what does the benefit to the insider have to be? Not the tippee. Of course the tippee is going to— What if the insider—isn't there a reasonable inference that the insider here felt that he owed a debt to his brother? No. Why not? His brother had helped him put him through school, had cared for him when he was ill. Why isn't that a sufficient—sounds like a very close relationship. I don't think, Your Honor, that that was ever— that was never the government's theory and it was never argued, and I don't think it's a reasonable— Did the jury hear that evidence? The jury did hear that evidence, talking about basically the background between the two brothers. The benefit that Maher got—they asked him that question specifically— was getting Michael off his back. Michael was bugging him and bugging him and bugging him for information. Maher didn't want to think he was trading— Which was sufficient under the instruction that the court gave, but arguably your argument is would not have been sufficient if Newman had been the law of the ninth circuit. That's exactly right. Thank you. Fair enough. Thank you, counsel. Thank you both for your argument. That will conclude our arguments today. We'll stand and recess.
judges: Rakoff, Christen, Watford